The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. Any persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit are admonished to give their attention for the Court is now sitting. God save the United States and this Honorable Court. Thank you, Madam Clerk. Our first case today is number 20-6426 Horner v. Nines. Mr. Jawar? Yes, Your Honor. You have the floor, sir. You represent the State of Maryland, Attorney General, correct? That is correct, Your Honor. Good to have you with us, sir. Thank you. Good afternoon to you all. I do represent the Respondents' Appellants in this case, which I'll collectively refer to as the State of Maryland for convenience. In this case, the District Court's decision to award a writ of habeas corpus to Matthew Horner on the grounds that Maryland's courts unreasonably applied Supreme Court precedent to reject his jury trial waiver and Brady challenges was a mistake under AEDPA. The District Court did not assess Horner's claims with the appropriate amount of deference. At various junctures, the Court did not focus on the last reason State Court decision, did not give the State Courts the wide berth they were entitled to in applying generalized Supreme Court standards, and purported to reject the State Court's credibility findings. This was no more obvious and pronounced than the decision to credit a different set of competing post-trial witness affidavits than had the State Post-Conviction Court, and the District Court did this without seeing any of these witnesses. Given the number of grounds that the Court decided below, there's a wide field of play that we could cover, and I don't suspect that I'll be able to address each equally, but I want to be as useful to the Court as possible. Unless the Court has specific concerns, which I'm more than happy to prioritize, I would like to suggest that perhaps we focus on the Brady and procedural default issues, since they might benefit most from a clarifying conversation. Well, you can do it however you want to do it. This is Judge King, uh, but I have some concerns about the waiver of the jury issue. I'll just alert you to that. So you frame it however you want to do it, but my colleague may have more specific concerns than I have. Go right ahead. Okay, well, I'll start there then, Your Honor. Um, the jury trial waiver in this case was not, uh, uh, or at least the Court of Special Appeals' affirmance of it was not contrary to Zerf's, uh, in an objectively unreasonable manner. Um, first of all, I think the District Court, uh, got hung up on some dicta in Patton to, uh, condemn essentially the colloquy, the solemnity of the colloquy, uh, which was really not the proper focus, since there really is no constitutional right to an on-the-record colloquy. Of course, we all know that such colloquies occur as a matter of course across the nation. They are required by court rules, uh, or case law, uh, but there is no constitutional right to an on-the-record colloquy. So to say— What is the—there's a constitutional right to, uh, the defendant making an express intelligent consent, is there not? There is, Your Honor. And that—you said, uh, the dicta thing, and that's what you have in your brief, and I just hope—and that was the very thing I had open here, uh, because they say that in Adams, two years after Patton, what you said was dicta, but this thing was dicta, the Supreme Court said, and they quote, unless they quote it wrong, citing Patton, we have already held that one charged with a serious federal crime may dispense with this constitutional right to jury trial where this action is taken with his express intelligent consent. So they use the word held in Adams, and you say it's dicta. So how do you get around what way the Supreme Court characterized it? Is that dicta, too? Uh, no, Your Honor, we do not disagree that the waiver must be knowing, intelligent, and voluntary. What we are saying, though, is that— And you agree that Patton held that? Uh, well, we—we agree that Zurst held that, um, and that was the claim— The Supreme Court in Adams cited Patton, and they called it a holding. At least, they said held. I assume that's a holding. And he says—I just couldn't understand—I don't know why you get into things like that. I mean, you've got a pretty good argument on this EDFA stuff, and then you—then you get off like that. Well, Your Honor, our point is that dicta is not something that the court, the district court, could use to condemn the waiver. There is a difference between the constitutional validity of the waiver, which Zurst says must be knowing and intelligent, and the quality of the colloquy and the content that must be in it. So the district court focused on the colloquy, which is dicta at best from the last paragraph of Patton only. There is a holding in Patton which deals with the knowing and voluntary law that must apply to the waiver. We don't dispute that. But the court didn't use that part of Patton. It used the last paragraph, which discussed the nature of the inquiry. And in Zurst, the court made very, very clear that what is fitting and appropriate, which is all that the court said with regard to an on-the-record colloquy, is that. It is fitting and appropriate, but it's not required as a constitutional matter. In fact, this court said in Kahn, which we've cited in our brief, that the focused on the last paragraph of Patton. That part is dicta. There are other holdings in Patton which are good law, and they're echoed by Adams, and they're echoed by Zurst. But we think that what the court did here was get confused between the waiver, examining the waiver, testing the waiver, and testing the nature of the colloquy and whether it was sufficiently solemn. The court said it was lip service, it was rote. But really, when you're the petitioner on collateral review, it is your obligation to show that you did not knowingly and intelligently waive. And the district court didn't engage that discussion. It relied entirely on its assessment of the colloquy. Do we give any deference to what the district court did? No, not in terms of the AEDPA analysis, not at all. Your review is DeNovo. No, we're looking at it DeNovo, aren't we? So we've got to go right to that record and figure it out under the authorities that you all, that you have just talked about, which they talk about too, Patton and Zurst and Adams. That's right, Your Honor. That's what we got to figure it out for ourselves. We don't give any deference to what the district court said or did. Go right ahead. Yes, counsel, can I? Counsel, this is Judge Quattlebaum. I have a question. If y'all are through for the time being on the jury trial, Judge Kenge, if you have follow up on that, I'm glad to hold off. No, I'm fine. You go right ahead, Judge Quattlebaum. I'm sorry. Well, it took too much, maybe. No, no, that's great. That was helpful. Counsel, I want to switch gears and talk about the Brady violation on the issue of whether Schaefer was a paid informant. And my question relates to information that the prosecutor learned during Schaefer's sentencing. And my question is whether that actual knowledge claim, based on what happened at the petition, was raised in the habeas petition. The district court didn't address it. And so was it raised in the petition, the habeas petition? Uh, no, Your Honor. The habeas petition that's been filed three times over, meaning we have an original and amended and a second amended, does not raise that particular claim. And I would point out that it was raised by previous post-conviction counsel in the 2010 UPPA, I'm sorry, post-conviction. It's a uniform post-conviction procedure act in Maryland, the UPPA court. But it was not the focus. It was procedurally defaulted because it was not made the subject of an application for leave to appeal to the Court of Special Appeals. And I can only take it for that reason that it was not, appropriately so, not raised in the habeas petition. Okay. All right. And I want to switch gears with one other question about that issue. And when I say that issue, I mean the paid informant question as a whole. One of the things we have to look at is materiality. And the district court considered materiality collectively, if you will, or cumulatively. And we don't, yeah, but the district court, and so how do we deal with materiality? Do we deal with it on an issue by issue basis? For example, do we look at materiality on this one Brady claim kind of in isolation? Or does the district court's determination on a cumulative basis bind us? I guess it's de novo, you think we could do it individually, issue by issue, right? Well, Brady law, Your Honor, directs that materiality is assessed cumulatively based on the total effect of each suppressed item's finding. So the thing that you need to do first is determine how many pieces of evidence are suppressed. And then you look through materiality as a whole. You don't isolate it piece by piece. So if we just, if, for example, hypothetically, we thought that was the only potential Brady issue, we would look at that issue as the only one since it's the only one suppressed. But if we found more than one, we'd look at them cumulatively, correct? That is correct, Your Honor. That is my, that is the state's understanding of Brady materiality law. The difficulty of the record, at least, and you are correct, you are to determine that afresh. You're not bound by district court's reasoning. But I have to say that the district court did not really treat this part of the UPPA court's legal reasoning distinctly. There's a portion of the opinion below that sort of mushes together after rejecting some of our procedural default arguments on some of the individual Brady claims, but then just sort of assumes that all of it's been suppressed without discussing it and doesn't really identify what things the court is considered suppressed. So you kind of wind up with this materiality discussion that acts as if it's all suppressed. And we certainly disagree with that. Had the court itemized its opinion a bit clearer, we might know precisely which things it considered in its materiality discussion, but that's not clear. Thank you. I see that my time is drawing nigh. I have about two minutes left. I think I will, at this point, yield. Very good. Judge Faxter, Judge Qualamon, do you have any further questions before you yield? I have no questions. I have none right now. Thank you, Judge King. Very good. We'll hear from counsel for Mr. Horner. And that's Mr. Naples. Thank you, Your Honor. Naples. Good to have you with us, sir. Good to be here, Your Honors. Thank you. Good afternoon, and may it please the court. My name is Pascal Naples, and I represent the District Court. The District Court correctly held that Mr. Horner has wrongly served 15 years because of a constitutionally defective trial. In particular, the District Court concluded that the state contravened Brady in failing to disclose six different pieces of exculpatory evidence related to the state's only two key witnesses at trial. In addition, the District Court ruled that record did not establish that Mr. Horner knowingly, voluntarily, and intelligently waived his right to a jury trial. As to the first Brady claim, the Supreme Court in Kyles v. Whitley held that information known to the prosecution, including the police, must be disclosed to the Kyles in holding that information known to a detective, Detective Hahn, regarding Mr. Schaffer's longstanding relationship with the police need not be disclosed to the defense. In particular, Detective Hahn testified at JA 347 that he received a call from Richard Schaffer regarding his intent to provide information about Mr. Horner. Detective Hahn then called the lead detective in the case, Detective Alex, then attended the first meeting between Detective Alex and Richard Schaffer, and then acknowledged that he was aware that Richard Schaffer was asking for a sentencing reduction in exchange for his testimony. On this record, it was objectively unreasonable to conclude under Kyles that the information known to Detective Hahn could not be imputed to the prosecution. But in this case, the record before the District Court was actually broader than it was before that of the first state PCR court. And therefore, this court, consistent with Monroe v. Angelone, can look de novo to the information that is before the court and assess the scope of Detective Hahn's knowledge and whether that has to be imputed to the prosecution. In particular, this is Judge Traxler. Can I ask you a question? What extra information is there that's before the federal court, the federal district court, that was not before the prosecutor Jennifer Schaffer testified at JA-2214 that she knew that Schaffer had a pre-existing relationship with another detective? And at JA-2149, Detective Alex testified that he knew that Schaffer was a paid informant. Now, the second state PCR court did not reopen Horner's testimony. They did not assess the imputation conclusion reached by the first state PCR court. So effectively, the federal district court and this court are the first courts to review the imputation claim in light of that testimony at the second PCR hearing. This information... I understand what you're saying. Okay. And you say that... So you say that scenario undercuts the application of the EDSA standard? That's correct, Your Honor. And that's consistent with this court's decision in Roe v. Angelone. When there's new evidence that has not been subject to a pre-existing state court determination, then it's incumbent upon the court to review that information de novo. Now, initially, under this set of facts, it's an unreasonable application of Kyle's to hold that Detective Han's knowledge cannot be imputed to the prosecution. But certainly, in light of the information established at the second round of PCR hearings, namely the testimony of Detective Alex and Prosecutor Jennifer Schaffer, the information of Detective Han could be imputed to the prosecution. And that information, this longstanding relationship between Detective Han and Mr. Richard Schaffer, a decade-plus paid informant relationship was alone material to the verdict and undermines confidence in that verdict. This is not a case in which there's a blank jury verdict in which this court has to guess at whether a determination was material or what motivated the jury's determination. Here, the judge said, the trial judge at JA-1021, that he paid, quote, particular attention to Schaffer's testimony. And Prosecutor Keith Pion emphasized that JA-1004, quote, he came to us without any kind of deal or offer. And Schaffer testified merely that he had provided information to a narcotics detective maybe 10 times and never received leniency or consideration in exchange for his testimony. That's at JA-1391. Of course, this court now knows that Schaffer had a decade-plus relationship with Detective Han, that he called Detective Han whenever he was arrested, and that charges were null-crossed in exchange for information provided, and that he was paid hundreds of dollars on multiple occasions in exchange for his testimony. And while that's what Richard Schaffer testified to at the second hearings, at JA-1151 through 1153, you need not take Richard Schaffer's word for it. Detective Han admitted at JA-332 through 34 that Richard Schaffer called him looking for assistance that Richard Schaffer was not an occasional cooperator, but a professional witness who had a revolving-door relationship with the police in this case. And given the reliance that the trial judge placed upon Richard Schaffer's testimony, that alone is sufficient to undermine confidence in the verdict and provide a basis for habeas relief. But it's not just the paid-informant relationship that undermines Richard Schaffer's testimony. It's also the fact, as revealed by Detective Alex in his second round of post-conviction testimony at JA-2156 through 57, that he investigated allegations that Richard Schaffer levied against Mr. Horner about other related deaths and confirmed with the Baltimore City Police Department that those allegations were inaccurate because the deaths were ruled accidental. This claim, in conjunction with the aforementioned claim about his paid-informant relationship, establishes that Richard Schaffer was willing to do and say anything in order to receive lenient treatment in exchange for his testimony. And that's exactly what he did in this case. Now, the state will argue that that particular claim has been unexhausted. But it was mentioned for the first time at the second round of PCR hearings before a court that had refused to reopen the Brady claims. And then it was raised in Mr. Horner's application for leave to appeal at JA-727. And Mr. Horner asked the Court of Special Appeals to reopen those Brady claims, thus sufficing to exhaust that claim. But it's not just the evidence that fundamentally undermines one of the state's key witnesses. Indeed, as the district court recognized, there are Brady claims undermining the testimony of the state's other key witness in the case, Ms. Lorraine Smith, particularly that she informed the prosecution that she had no independent recollection of the events of the about the alleged shooting by the state in advance of her testimony. Now, as to Ms. Smith, the state accuses Mr. Horner of asking this court to reweigh an evidentiary contest fought before the state court. But in Gray v. Zook and Moore v. Hardy, this court drew a distinction between ignorance of evidence in the record and simply misweighing evidence in the record. And it's in the former category in which the state court's determination applies. Here, the state PCR court ignored critical evidence establishing the veracity of Ms. Smith's three days before Ms. Smith signed her recantation in which she affirmed all of the statements that would then become the basis for her January 9th recantation. Ms. Smith testified before the second post-conviction court at JA 1880 through 1887 that the statements in the recantation were consistent with her preexisting email, that she sent the email of her own abolition, and that the email provided the source for the January 9th recantation. Instead, the state PCR court, as the district concluded, conspicuously omitted any reference of that January 6th email. And instead, Block quoted an email from the day before in which she said she didn't think that Mr. Horner deserved to be tried. The state court's explanation of the facts and decision to discredit Ms. Smith's recantation based on the fact that she was pressured to execute that recantation was objectively unreasonable in not grappling with that January 6th email. But that's not all that the state PCR court in the second round of post-convictions ignored on this record. Indeed, as the district court recognized, the state court did not assess Ms. Smith's testimony that she had no concerns about pressure from Mr. Horner's counsel at JA 1910 through 1912, or Ms. Smith's testimony that her execution of the recantation on January 9th was completely voluntary at JA 1850 through 54, or Detective Alex's testimony that he provided Ms. Smith with information about the shooting through forced answer questions at JA 2143 through 2162. Instead, the state court chose to rely on a May affidavit, but that May affidavit by Ms. Smith was significantly undermined by her testimony at the post-conviction hearing, all of which the state PCR court did not even grapple with. Indeed, Ms. Smith testified that she could not recall who wrote the affidavit, who gave the affidavit to her, how she got it, and she could not recall it in general, all of which is available to this court at JA 1890 through 91. In short, the distinction is between ignoring critical evidence in the state court record and simply reweighing that evidence. Here, the district court rightly determined that the state court reached an unreasonable determination of fact as to the Brady claims against Ms. Smith because it ignored critical evidence, not simply that it misweighed that evidence. Now, the state has attempted to cast this claim against Ms. Smith as about nothing more than the January 16th mail and argued that that email was inadmissible. Now, as pointed out, it's about much more than just the January 16th email that the state PCR court ignored. However, it's worth pointing out that the January 16th email was read into the record before the state PCR court and used to impeach the later May affidavit, to bolster the claim that the January 9th recantation was provided under duress, and therefore was properly before the second state PCR court to consider. The court simply declined to consider that piece of evidence. On a final note, it's not as though the January 16th email was simply mentioned in passing in a moment of cross-examination. Petitioner's counsel in closing for the second state PCR court emphasized that email at JA-2241, and the second sentence of counsel for Mr. Horner's rebuttal for the state PR court at JA-2257 was this, quote, Ms. Smith's email of January 6th is the controlling communication here. It was an unreasonable determination of fact for the state court to ignore this critical evidence that it had before it. And as a result, it reached an unreasonable conclusion as to these Brady claims. In sum, the district court rightly concluded that the state failed to disclose six different pieces of exculpatory evidence related to its only two key witnesses in this case. And therefore, this court should affirm. But that's not the only reason that this court can recognize that the state court record does not establish a knowing, voluntary, and intelligent waiver of Mr. Horner's right to a jury trial. As to this, it's important to remember that a function that where the courts come out is often a function of where they go in. And Supreme Court precedent and Zerks and otherwise makes clear that courts must indulge every presumption against the waiver of constitutional rights. And so- Mr. Naples, this is Judge King. If we were to agree with you on the waiver of the right to make a proper waiver, then the whole trial falls away. You'd have to start all over with you. That's correct, Your Honor. Either claim, standing alone- I don't understand. You're telling me like you got things kind of backwards when you argued about the trial. Now you're arguing that the trial is flawed completely because we didn't make a proper waiver. And that's what I'm getting at. If you're right there, we don't have to decide these Brady questions at all. And neither did the district court. That's correct. That's correct, Your Honor. And the trial was problematic from the outset due to the inadequate waiver of the right to a jury trial. And so it's true that the Brady claims fall away if this court finds that inadequate waiver to a jury trial. If a state says that under EDPA, that the state court got it figured out well enough that the waiver's got to be sustained, that's what you've got to get around. It seems to me, it's whether EDPA blocks you out. Here's where the state misapplies EDPA deference in this case. The Court of Special Appeals cannot unreasonably apply clearly established Supreme Court precedent. And Supreme Court precedent dictates that courts must indulge every reasonable presumption against the waiver of a constitutional right and that jury trial waivers must be knowing, voluntary, and intelligent. Based on this record, the only way that the Court of Special Appeals could have concluded that the waiver was knowing, voluntary, and intelligent was to misapply the burden of proof in the first instance. And indeed, if this court looks to the decision of the Court of Special Appeals, it is riddled with charges that Mr. Horner did not sufficiently speak up and object when his counsel attempted to waive the right to a jury trial for him or did not seek clarification of the right to the jury trial. But the Supreme Court has clearly placed the burden on the state in the first instance to ensure that that right is protected. And in this instance, that right was not sufficiently protected on the basis of no more than a five-sentence colloquy, which made no examination of Mr. Horner's background and circumstances, no examination of the charges of the potential sentence, no examination of the particular waiver of the right to a jury trial, simply acquiesced in his counsel's waiver. Counsel, this is Judge Quattlebaum. As you go through and list the things that weren't done, yet isn't that pretty close to, as a practical matter, imposing Rule 11 requirement as a matter of constitutional law? Your Honor, I see them out of time. May I respond? You may. You answer all the questions. Don't you worry about the time. If you get a question from one of the judges, you answer it the best you can. Thank you, Your Honor. Judge Quattlebaum, there are certainly no magic words that a trial court must say in order to ensure the waiver of a right to a jury trial. And there was no attempt here by the district court or by Mr. Horner to impose Rule 11-like strictures upon the state trial court. But it must be knowing, voluntary, and intelligent, and the state must set the burden in the first instance. And it's incumbent upon the federal courts to look to the record and assess whether the record suffices to show a knowing, voluntary, and intelligent waiver. And this record does not meet that burden. Anything further, Judge Quattlebaum? No, thank you, counsel. Judge Traxler? No questions. Thank you, Mr. Naples. We appreciate it. Appreciate your work in this case. Thank you for being with us. Mr. Jabar? Yes, thank you, Your Honor. You have reserved some time. Yes, sir, go ahead. Yes, I reserved five minutes. With respect to the jury trial waiver, my colleague misunderstands the assignment of burdens between direct appeal and collateral review. Because an on-the-record colloquy is not even required as a matter of constitutional law, only a valid waiver. The defects in the supposed litany, which isn't constitutionally required, don't go the distance to show on collateral review that he did not waive. He had a burden on collateral review to establish that he did do so. And there is no record from Mr. Horner objecting to what he said on the record, which is that he agreed with his attorney's advice and counsel's representation that they had discussed the matter fully. To the extent that the record does reveal- But the waiver standard is in Zerps, and not- That is correct. That's the primary authority. I think you agree with that. I agree with that, Your Honor. That's been called the Zerps waiver standard. As a matter of fact, I think that Justice Scalia referred to it and acknowledged that it's something and how it's applied, they're familiar to the courts. That's right, Your Honor. Which was 1938. We're going back quite a ways here. Patent was in 1930, and then they came along with the waiver standard in 1938. Who wrote that Zerps case? Do you remember? I honestly don't recall, Your Honor. Sutherland wrote the one about patent, I think. Justice Sutherland. Justice Black wrote Zerps. Justice Black. Justice Black. Thank you, Judge Braxton. So you go right ahead. I just wanted to get you to acknowledge that we're talking about the waiver standard. We're talking about Zerps rather than patent. Go ahead. Right. Under Zerps, we certainly have enough information in this record. Zerps is a general standard. So the courts have wide berth in applying the particulars. Here, we have to remember that the trial court said that you have a right to a jury trial, that there would be 12 people chosen at random from the community. He didn't say you have a right to a jury trial. He didn't say that. He said you understand what a jury is. He talked about a jury. He didn't talk about a jury trial. Your Honor, I think- The Maryland court talked about a jury trial. They admitted he was talking about a jury trial, but I don't think the words jury trial were there for you. Go ahead. I'm referring to the colloquy, Your Honor, and the court said you have the right to a jury trial at 1638 of a joint appendix. Not only that he had the right, but that they would be chosen at random from the community. He'd have the right to participate in the selection of those jurors, and that any verdict would have to be unanimous, and that they would have to find a reasonable doubt and to a moral certainty that he was guilty. We believe that as to the sufficiency of the colloquy, it certainly is enough to establish the knowingness, and that the CSA, the Court of Special Appeals, is not objectively unreasonable for finding that that was enough. If I may address some of my colleague's points about the Brady issues, I want to make perfectly clear that under Kyle's, which my colleague spent a good five to six minutes talking about, the only fact of which the defense ever claimed it was unaware was the fact that he had been occasionally paid, Mr. Schaffer, for some of his undercover work. The relationship, the 10-year relationship, defense counsel admitted at the 2010 UPPA hearing, he was fully apprised of that. So some of my counsel's rhetoric, which seems to waffle between the 10-year relationship and the separate issue of whether he was in fact paid, is meant to augment and sort of cover over some of the materiality problems with their claim. With respect to unrelated deaths, I want to point out that the state actually disclosed that, as we've argued in our brief, in their supplemental disclosures. The UPPA Court found that as a matter of fact. And as to Ms. Smith, I really don't have the time to regale the court with our very distinct understanding of the record. But I think what you heard demonstrates in and of itself that this was an evidentiary contest. And there was evidence on both sides. Under 2254 D2, to be objectively unreasonable, a fact-finding has to lack evidentiary support to a degree beyond the clearly erroneous standard, which applies on direct appeal. The Second Circuit has said that that means that the UPPA Court must have misstated or misapprehended the record. There's no allegation of that. The UPPA Court simply chose different emphases and found different aspects of the record appealing and credible to it. Counsel, this is Judge Qualabong. Returning back to the Schaefer issue, I want to make sure I said in response to your colleague's argument. He referred to certain testimony, I think, from the second TCR hearing that he said we aren't, that it doesn't fall under the EDPA deference standard. Is it your testimony, or not testimony, sorry about that, is it your position that what he said, I think you were just saying, what he said didn't relate to the paid issue, or were you responding to that in some other way? Well, there's two different points to be made there. One is that with respect to Schaefer's relationship with Detective Hahn, that was fully understood and known by the defense. The only thing that's been negated in this case was the defense did not know was that he was occasionally paid. My colleague here paints with a broad brush in referring to the relationship as a whole. I want to make sure the court understands that the relationship was fully disclosed and cross-examined. In fact, the trial court made mention of that in its verdict. Now, the other point that my colleague made was that the court now should consider that Detective Alex had direct knowledge because he testified to that. I don't want to belabor the point, but in our reply brief, page 20, we address this. This is a whole section of our brief. This argument that Detective Alex had direct knowledge is based upon the cross-examination that was done in 2018, and that's not before this court. It wasn't even argued to the district court. This is trotted out for the first time before you. This is not new evidence that escapes Edpo review. It is completely procedurally defaulted because it could have been argued in the 2010 hearing when this issue was fully ventilated, but they didn't call Detective Alex. They only rely on Detective Hahn. If you read Detective Alex's testimony in 2018, he's actually not speaking from the perspective of trial. He's speaking from his perspective in 2018, meaning he didn't know himself in the time of trial that even there was a relationship at that time. Detective Alex did not know, much less that he was being paid. That section of our brief should adequately respond to that. That's not an opportunity to avoid Edpo. It's actually an affirmative problem. For those reasons, we would ask the court to reverse the judgment below. Judge King, I have one more question. I have one more. I apologize, Judge King. Go ahead, Judge Quattlebaum. Go right ahead. So, my question relates to an issue that you, I think, raised about piecemeal litigation, and I understand that point. I understand your argument, I think. What are you asking us to do with respect to that issue? Obviously, the district court didn't address the Strickland claim, and you requested that be done below. Are you suggesting that we do anything about that issue at this stage? What I would ask, Your Honor, is for an opinion that as a matter of the court's supervision of the district court, its inherent authority to supervise the proceedings, that you adopt the policy of the Clisby decision and jurisprudentially prevent this in future cases. At this point, I don't know that the court can really economize the case. It seems to me that we're going to be facing these Strickland claims in a future proceeding should the state prevail here. But either way, it prolongs the litigation in ways that contravene everybody's interests. It contravenes the victim's interest against unreasonable delay, which is a right under the Victims' Rights Act. It certainly contravenes the state's interest in the expeditious resolution of these cases and to limit federal interference with its judgments and its correctional programs. And it even hurts the petitioner because, as you know, the pendency of a federal habeas petition doesn't toll the statute of limitations. So you might expose those claims. Should the court do this again to a previously unavailable affirmative defense? Could also face a successiveness problem. So this type of saving claims for later is antithetical certainly to the spirit of the final judgment rule. And we would ask that you jurisprudentially recommend against it so that district courts don't do this in the future. Thank you. You don't like the way they did it here. I'm sorry, Your Honor. You don't like the way they did holding some issues back? That's right. What about the question that I asked your colleague there, Mr. Naples, about if the plea or the waiver is defective, why we wouldn't stop right there, not address these Brady issues or anything else? You disagree with that, too? No, I don't disagree with you, Your Honor. And an affirmance on any one of the grounds found by the district court could potentially obviate the rest. Thank you, sir. Thank you, Your Honors. Appreciate the arguments of counsel. Your case will be taken under advisement.
judges: Robert B. King, A. Marvin Quattlebaum Jr., William B. Traxler Jr.